MURGUIA, Circuit Judge,
concurring in part and dissenting in part:
I fully agree with the opinion’s analysis as to the scope of this court’s jurisdiction to review the district court’s denial of summary judgment on qualified immunity grounds, and with its conclusion that the district court erred in denying qualified immunity to Wojcik and Savage. However, even accepting as true the plaintiffs’ version of events, see Behrens v. Pelletier, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), I respectfully disagree that the plaintiffs have presented a cognizable claim that Wojcik and Savage affirmatively acted with deliberate indifference to Pau-luk’s substantive due process rights under the state-created danger doctrine.[1]
I.
The state-created danger exception is a logical corollary to the well-settled rule that the government has no general duty under the Constitution to protect people from privately-inflicted harm. In DeSha- *1127 ney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court declared that “nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors,” id. at 195, 109 S.Ct. 998. In the same breath, however, the Court also recognized that there may be circumstances in which the government must provide protection because it “played [a] part in the[ ] creation” of a dangerous situation or did something “to render [an individual] more vulnerable to” a pre-exist-ing danger. Id. at 201, 109 S.Ct. 998. It is when “the state has affirmatively placed the plaintiff’ in harm’s way that a reciprocal duty to protect may attach. Ketchum v. Alameda County, 811 F.2d 1243, 1247 (9th Cir.1987) (emphasis added).
But inherent in our characterization of the state-created danger doctrine as an “exception” to the ordinary rule, see Patel v. Kent Sch. Dist., 648 F.3d 965, 972 (9th Cir.2001), is the principle that the government does not violate the Constitution “whenever someone cloaked with state authority causes harm,” County of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The substantive component of the Due Process Clause only prevents the state from engaging in conduct “intended to injure in some way unjustifiable by any government interest.’’ Id, at 849, 118 S.Ct. 1708. “[0]nly the most' egregious official conduct” crosses the constitutional line so as .to constitute a deprivation of due process. Id. at 846, 118 S.Ct. 1708. To this end, we have made clear that gross negligence on the part of the government actor is not enough. Patel, 648 F.3d at 974; L.W. v. Grubbs (“Grubbs II), 92 F.3d 894, 900 (9th Cir.1996); see also Lewis, 523 U.S. at 849, 118 S.Ct. 1708 (“[Liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.”). As the opinion observes, an individual can recover on a § 1983 claim under the state-created danger doctrine only by showing that the state officials in question acted with “deliberate indifference” to a “known or obvious danger” that they had an affirmative role in subjecting the plaintiff to. Patel, 648 F.3d at 974; Grubbs II, 92 F.3d at 900.
As my concurring colleague notes, Collins v. City of Harker Heights, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), on which defendants primarily rely, does hot itself speak to the scope of the state-created danger doctrine. Nevertheless, it is easy to situate its holding within the aforementioned framework. In Collins, the Supreme Court applied the general rule that state actors are liable only for actions that violate constitutional rights, not omissions, and concluded that the Due Process Clause does not impose a freestanding duty upon a municipality to provide its employees with certain minimal working conditions.[2] 503 U.S. at 125-30, *1128 112 S.Ct. 1061; cf. Deshaney, 489 U.S. at 195, 109 S.Ct. 998 (“The [Due Process] Clause is phrased as a limitation on the State’s power to act, not as a guarantee of certain minimal levels of safety and security.”). At the same time, however, nothing in Collins abrogated the Constitution’s guarantee of freedom from unreasonable state-created dangers. In other words, public employees — like any citizen — can recover under the state-created danger doctrine for workplace injuries that are severe enough to offend due process — provided, of course, that the employee shows that a state official affirmatively created the unsafe working environment and acted with the requisite deliberate indifference in subjecting the employee to that workspace. See, e.g., L.W. v. Grubbs (“Grubbs 974 F.2d 119, 122 (9th Cir.1992) (finding nurse’s status as prison employee did not bar her § 1983 claim after she was raped by a violent sex offender after being assigned to work alone in the medical clinic with him).
With these principles in mind, I turn to the issue on which I diverge from the opinion: whether two municipal supervisors violated a federal constitutional obligation after an employee died from a generalized exposure to toxic mold.
II.
As noted above, the state-created danger doctrine requires affirmative action by state officers; the state’s failure to protect an individual from an unsafe environment does not give rise to liability under the state-created danger doctrine. Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 (9th Cir.2006). We have clarified that “affirmative conduct” means that the state’s actions must have placed the plaintiff in a “worse position than that in which he would have been had it not acted at all.” Johnson v. City of Seattle, 474 F.3d 634, 641 (9th Cir.2007) (quoting DeShaney, 489 U.S. at 201, 109 S.Ct. 998); see also Kennedy, 439 F.3d at 1062 (“[W]e examine whether-the [official] left the person in a situation that was more dangerous than the one in which they found him.” (citation omitted)). In the context of this case, I believe that there are two reasons why the plaintiffs’ allegations fail to satisfy this standard — one factual, one jurisprudential.
A.
First, the universe of evidence from the summary judgment record that a reasonable jury could attribute to Wojcik and Savage is scant. Accepting the plaintiffs’ version of events as true, as we must at this interlocutory stage, Pauluk was a veteran employee of the CCHD who died after being exposed to toxic mold at Shadow Lane, where he was reassigned over his objections in 2003. It is undisputed that Shadow Lane suffered from structural deficiencies in the building that let in rainwater.
During his tenure there, Pauluk repeatedly complained about mold to the intermediate supervisors in his chain of command, which included the defendants Wojcik and Savage, both of whom also worked at Shadow Lane. Specifically, Pau-luk requested to transfer out of Shadow Lane or to move desks within the building. Whenever Pauluk would make such a request, it would be sent to his immediate boss and then “funnel[ed]” up to Wojcik and Savage. On one occasion, Pauluk personally asked Wojcik for a transfer, but Wojcik told Pauluk that he needed to follow the proper “channels]” when making a transfer request. All of Pauluk’s transfer requests were ultimately denied. Savage was told that transferring Pauluk would result in “chaos to the overall business of *1129 the Health District” and that Pauluk’s position involved a “main office function”— the main CCHD office being the Shadow Lane facility. Nevertheless, in 2003, in response to Pauluk’s concerns, ceiling tiles were removed and tested for mold. Savage also assisted Pauluk in 2004 with taking photographs of suspected mold growth and forwarding it to the administration, and Wojcik sent an e-mail to his chain of command seeking to have the materials gathered by Savage and Pauluk tested. As a result of their efforts, maintenance staff removed and replaced four stained ceiling' tiles and one fluorescent lens near Pau-luk’s work station. In the end, however, Pauluk left Shadow Lane in October 2005 due to medical problems associated with “[tjoxic mold exposure.” Unfortunately, Pauluk’s health continued to deteriorate and he died in 2007.
The family’s primary contention is that Wojcik and Savage failed to protect Pauluk from exposure to mold by not transferring him away from Shadow Lane. But keeping Pauluk at a facility that was infested with mold is not “affirmative action.” See Kennedy,. 439 F.3d at 1062 (“In examining whether an officer affirmatively places an individual in danger ... we examine whether the officer[ ] left the person in a situation that was more dangerous than the one in which they found him.”). The family also argues that Wojcik and Savage acted affirmatively by denying Pauluk’s requests to transfer. However, these actions fail the “no worse position” test too: regardless of whether defendants denied Pauluk’s requests or simply ignored them, Pauluk would have remained in the same position' — purportedly being exposed to toxic mold at Shadow Lane. See Johnson, 474 F.3d at 641 (concluding that city’s decision to switch from a more effective crowd-control procedure to a less effective plan was not “affirmative action,” precluding liability to plaintiffs who were injured during a riot at a Mardi Gras celebration).
The opinion nevertheless concludes that Wojcik and Savage’s decision to transfer Pauluk back to the Savage Lane facility in 2003 constitutes the requisite affirmative action. But in opposition to the defendants’ motion for summary judgment, plaintiffs insisted that CCHD exposed Pauluk to mold on two other occasions prior to 2003 — in 1998 and 2000. See Plaintiffs’ Opposition to Defendants’ Motion for Summary Judgment, Pauluk v. Savage, No. 07-CV-1681 at *10 (D. Nev. Oct. 7, 2013), ECF No. 131 (“[T]he record evidence shows CCHD affirmatively placed Dan Pauluk in harms way on no less than three (3) occasions — in 1998, 2000 and 2003— then the Defendants have failed to meet their burden on summary judgment in that the Defendants affirmatively and with deliberate-indifference engaged in conscience-shocking conduct.”). If Pauluk’s risk of illness from mold exposure predated his 2003 reassignment to Shadow Lane, then Wojcik and Savage could not have placed Pauluk in any worse of a position than if he had never been transferred. Therefore, even reading the record in the light most favorable to the plaintiffs, plaintiffs’ claim fails as a matter of law because, after the 2003 transfer, Pauluk was in “no worse position” than before. See Johnson, 474 F.3d at 641.
B.
I further disagree that moving Pauluk back to Savage Lane amounts to “affirmative action” in the constitutional sense. The previous circumstances in which this court has grappled with the state-created danger doctrine do not remotely resemble the facts of this case. Every instance in which we have permitted a state-created danger theory to proceed has involved an act by a government official that created an obvious, immediate, and “particularized danger” to a specific person known to that official. See Kennedy, 439 F.3d at 1067 (explaining that “affirmative action” re *1130 quires the state actor to “create[ ] an actual, particularized danger [the injured party] would not otherwise have faced”). We have also extended the doctrine only to encompass claims in which the official’s act caused the harm, as opposed to merely increasing a risk to the plaintiff.
In this circuit, the state-created danger doctrine begins with Wood v. Ostrander, in which the court held that police officers who had stranded a woman in a high crime area at 2:30 in the morning could be liable under § 1983 after the woman was sexually assaulted. 879 F.2d at 588-90. Similarly, in Penilla v. City of Huntington Park, we denied qualified immunity to officers who had responded to a 911 call, found Penilla to be in grave need of medical care, and yet canceled the request for paramedics, broke the lock and door jamb on the front door of Penilla’s residence, moved him inside the house, locked the door, and left him to die. 115 F.3d 707, 708 (9th Cir. 1997). And, in Munger v. City of Glasgow, we found evidence of affirmative action by the state where police officers ejected an intoxicated patron from a bar wearing only a t-shirt and jeans in sub-freezing temperatures; the patron died from hypothermia. 227 F.3d 1082,1087 (9th Cir.2000).
In Kennedy v. City of Ridgefield, we likewise affirmed the denial of qualified immunity to a police officer who had informed the plaintiffs neighbor — an individual with known violent tendencies and against whom the plaintiff had made allegations of child abuse — that he was being investigated for molesting the plaintiffs daughter. 439 F.3d at 1057, 1067. The officer had promised to warn the plaintiff before approaching her neighbor, and assured her that police would patrol her neighborhood. Id. at 1058. The neighbor later broke into the plaintiffs house and shot her and her husband while they were sleeping. Id. at 1058. The Kennedy court explained that the officer had “affirmatively created an actual, particularized danger [the family] would not otherwise have faced” by confronting the suspect without notifying the Kennedy family as promised. Id. at 1063.
Kennedy relied substantially on our’s holding in Grúbbs I, in which we found that a nurse in a medium-security correctional institution had stated a claim under the Fourteenth Amendment after an inmate with known violent propensities raped and terrorized her. Grubbs I, 974 F.2d at 120-22. State officials had assigned the inmate to work in the medical clinic with the plaintiff and had failed to inform her that she would be left alone with violent sex offénders. Id. at 120. The Grubbs I court concluded that the plaintiff had adequately alleged that the defendants’ acts had “independently created the opportunity for and facilitated [the inmate’s] assault on her” and allowed her claim to proceed to trial. Id. at 122. The court emphasized that, in assigning the inmate to work with the plaintiff while also misrepresenting the risks attending to the plaintiffs work, the defendants had created the danger by preventing the plaintiff from defending herself or averting an attack.[3] Id. at 122.
The common elements in all of these cases that justified our imposing liability were the acuteness of the danger to the plaintiff, the temporal proximity between the official’s act and the injury, and the clear traceability of the injury to the official’s conduct. The facts here are markedly different: the plaintiffs have alleged that *1131 Wojcik and Savage violated Pauluk’s constitutional rights by moving him into a municipal building where he was exposed to toxic mold over the course of several years — along with countless other employees, including the defendants. Wojcik and Savage’s decision to reassign Pauluk more closely resembles the cases in which this court has declined to find a cognizable due process violation due to the unforeseeable nature of the' plaintiffs’ injuries and the fact that the danger facing the plaintiff existed independent of state action. See, e.g., Patel, 648 F.3d at 976 (holding no rational fact finder could conclude that a teacher acted with deliberate indifference to her student’s well-being because the teacher “did not know there was any immediate danger in allowing [the plaintiff] to briefly use the next-door bathroom alone”); Huffman v. County of Los Angeles, 147 F.3d 1054, 1061 (9th Cir.1998) (finding no liability where an individual was shot during a barroom brawl' by an off-duty deputy on the grounds that the injury was an unforeseeable consequence of a county policy requiring off-duty officers to carry a firearm); see also Lawrence v. United States, 340 F.3d 952, 957 (9th Cir.2003) (“[I]n each of the cases in which we have applied the danger-creation exception, ultimate injury to the plaintiff was foreseeable.”). The link between the challenged conduct and Pauluk’s untimely death is simply too attenuated to support Wojcik and Savage’s liability.
III.
In addition to showing affirmative conduct, the family must also show that the defendants acted with “deliberate indifference” to Pauluk’s health and safety. We have repeatedly affirmed that the standard for deliberate indifference is demanding; it requires a showing that the “defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff.” Grubbs II, 92 F.3d at 899’ (citation omitted); see also Patel, 648 F.3d at 974 (“Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.” (internal quotation marks omitted)). The defendant is liable if he “knows that something is going to happen but ignores the risk.” Grubbs II, 92 F.3d at 900 (first emphasis added).
The opinion concludes that the deliberate indifference requirement is satisfied because Wojcik and Savage were aware that the CCHD had a history of pervasive mold problems throughout multiple buildings, and that Shadow Lane suffered from water damage. There is some evidence that one other employee working in Shadow Lane suffered from the ill-effects of mold exposure before Pauluk was transferred back to the facility.
■I disagree that these facts, alone, demonstrate Wojcik and Savage’s deliberate indifference to any danger Pauluk was exposed to at Shadow Lane. In Penilla, by contrast, the officers knew Penilla was in grave condition and required prompt medical attention, yet they did the opposite of what a reasonable person would expect them to do. In fact, the. officers made the situation worse by calling off medical assistance already en route. Penilla, 115 F.3d at 708. Kennedy and Grubbs both concerned circumstances in which the government official actively concealed a known risk of harm, from the plaintiff. Here, at most, Wojcik and Savage knew that a workplace free of mold was preferable to one with piold, but do not appear to have been aware that moving Pauluk to a contaminated building would cause him to become deathly ill.[4] See Patel, 648 F.3d at *1132 975-76 (refusing to find liability where extent of the risks were unknown to the defendant). Further, the family admits that Savage “assisted] Pauluk” in his attempts to report the mold problems by “removing ceiling tiles, looking above the ceiling tiles and taking photographs in the area where Pauluk’s desk was loeat[ed].” This indicates that Savage was sensitive to Pauluk’s complaints and wanted them to be resolved. Wojcik demonstrated similar sympathy towards seeing Pauluk’s concerns addressed. Without the requisite mental state, there can be no constitutional violation premised on state-created danger.
IV.
As in all state-created danger cases, the facts before us are undeniably tragic. But the Fourteenth Amendment is not a panacea for all wrongs. The Supreme Court “has always been reluctant to expand the concept of substantive due process,” and the Fourteenth Amendment “does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.” Collins, 503 U.S. at 125, 128, 112 S.Ct. 1061; see also Lewis, 523 U.S. at 848, 118 S.Ct. 1708 (“[T]he Fourteenth Amendment is not a ‘font of tort law to be superimposed upon whatever systems may already be administered by the States.’ ”). To the extent Pauluk has a remedy, I believe it is properly found under Nevada state law. See Patel, 648 F.3d at 976 (“Whatever liability [the defendant] may face, that liability must come from state tort law, not the Fourteenth Amendment.”). Because I cannot join my esteemed colleagues in their sweeping holding that the facts alleged establish a Fourteenth Amendment violation by Wojcik and Savage, I respectfully dissent from that portion of the opinion.

. I note at the outset that the constitutional issue on which I dissent is not dispositive to this appeal, and I would not have reached it at all — -particularly in light of the fact that the liability of the entity who appears the most responsible for the decedent’s injuries — the Clark County Health District ("CCHD”) — remains outstanding. As a municipal entity, the CCHD has no immunily under § 1983 and is not a party to this appeal. See Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). CCHD’s potential liability under Monell is therefore not an' issue that is presently before us on interlocutory review from the district court's denial of qualified immunity to the individually named defendants.

. The plaintiff in Collins had brought suit after her husband, a city employee within the sanitation department, died of asphyxia in a manhole where he was fixing a sewer line. 503 U.S. at 117, 112 S.Ct. 1061. The employee's widow alleged that the city had violated the decedent’s liberty interest by failing to train its employees about the dangers of working in sewer lines and manholes or provide adequate safety equipment at job sites. Id. The Collins Court firmly rejected the plaintiffs theory of liability, concluding that nothing in the Constitution imposes a duty on municipal entities to provide a reasonably safe work environment for its employees. Id. at 126, 112 S.Ct. 1061. Nor did the city’s purported failure to train or warn its employees amount to an omission that the Supreme Court believed could be properly characterized as arbitrary or conscience-shocking in the substantive-due-process sense. Id. at 128, 112 S.Ct. 1061. In no uncertain terms, the Supreme Court held that “[t]he Due Process Clause ... does [not] guarantee municipal employees a workplace that is free of unrea *1128 sonable risks of harm ."Id. at 129, 112 S.Ct. 1061.

. The court never had to evaluate the qualified immunity question in Grubbs, which came to the court on an appeal from a motion to dismiss. Following a trial, however, the jury found that the supervisor who was responsible for creating the danger to the plaintiff had acted only with gross negligence, but-not with the deliberate indifference necessary to sustain liability. Grubbs II, 92 F.3d at 895.

. The opinion’s assertion that Wojcik and Savage actively tried to conceal the existence. *1132 of mold is not supported by the record.