**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WENDY J. PAULUK, Psy.D, individually and as personal representative of the proposed Estate of Daniel Pauluk; JAIME L. PAULUK; CHRISSY J. PAULUK, *Plaintiffs-Appellees*, <br><br> v. <br><br> GLENN SAVAGE, an individual; EDWARD WOJCIK, an individual, *Defendants-Appellants*. | No. 14-15027 <br><br> D.C. No. 2:07-cv-01681-PMP-VCF <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, Senior District Judge, Presiding

Argued and Submitted February 11, 2016
San Francisco, California

Filed September 8, 2016

Before: John T. Noonan, William A. Fletcher,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge W. Fletcher;
Partial Concurrence and Partial Dissent by Judge Murguia
Dissent by Judge Noonan

## SUMMARY[*]

### Civil Rights

The panel reversed the district court's order, on summary judgment, denying qualified immunity to two employees of the Clark County Health District in an action brought pursuant to 42 U.S.C. § 1983 by the widow and daughters of Daniel Pauluk, an employee of the Health District, who died allegedly from toxic mold in his workplace.

The panel first held that in this interlocutory appeal it had jurisdiction to decide whether the evidence demonstrated a violation by the defendant employees, and whether such violation was in contravention of federal law that was clearly established at the time.

The panel held that viewing the facts in the light most favorable to plaintiffs, they had shown a violation of the constitutional right, grounded in the Fourteenth Amendment's Due Process Clause, to be free of state-created danger. The panel held that the Supreme Court's decision in *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), declining to find a general due process right to a safe workplace, did not bar plaintiffs' due process claim brought under the state-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

created danger doctrine. The panel nonetheless reversed the district court's order denying qualified immunity because the panel determined that it was not clearly established, at the time of the unconstitutional actions, that the state-created danger doctrine applied to claims based on physical conditions in the workplace.

Concurring in part and dissenting in part, Judge Murguia agreed with the opinion's analysis as to the scope of the court's jurisdiction to review the district court's denial of summary judgment on qualified immunity grounds, and with its conclusion that the district court erred in denying qualified immunity to the defendant employees. She respectfully disagreed with the opinion's conclusion that plaintiffs presented a cognizable claim that defendants affirmatively acted with deliberate indifference to Pauluk's substantive due process rights under the state-created danger doctrine.

Dissenting, Judge Noonan stated that the law governing the state-created danger doctrine was clearly established at the time and that any reasonable official in defendants' shoes would have understood that they were violating it.

## COUNSEL

Peter M. Angulo (argued) and Walter R. Cannon, Olson, Cannon, Gormley, Angulo & Stoberski, Las Vegas, Nevada, for Defendants-Appellants.

John J. Tofano (argued), Las Vegas, Nevada, for Plaintiffs-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

This appeal stems from the death of Daniel Pauluk, an employee of the Clark County Health District ("CCHD") in Nevada. Pauluk's widow and daughters sued the CCHD and two of its employees, Edward Wojcik and Glenn Savage, alleging that their exposure of Pauluk to a workplace environment infested with toxic mold caused his death, in violation of the Due Process Clause of the Fourteenth Amendment. The district court denied summary judgment to Wojcik and Savage (collectively, "individual Defendants"). They bring an interlocutory appeal, contending that they are entitled to qualified immunity.

This case lies at the intersection of two lines of authority—on the one hand, the state-created danger doctrine under which constitutional due process claims may be brought; on the other, the Supreme Court's decision in *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), declining to find a general due process right to a safe workplace. We hold that *Collins* does not bar Plaintiffs' due process claim. Plaintiffs have stated a claim under the state-created danger doctrine, notwithstanding the fact that the danger at issue is a physical condition in the workplace. However, we reverse the district court's denial of summary judgment as to Wojcik and Savage, on the ground that the due process right asserted by Plaintiffs was not clearly established at the time of the violation.

## I.  Background

## A.  Facts

Because this is an appeal from the denial of the individual Defendants' motion for summary judgment, we view the facts in the light most favorable to Plaintiffs.  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059 (9th Cir. 2006).  Except as noted, we recount the facts as viewed in this light.

Daniel Pauluk worked for the CCHD in Nevada as an Environmental Health Specialist from 1998 until illness forced him to take leave in 2005.  During his tenure at the CCHD, Pauluk was transferred a number of times.  He was initially assigned to the CCHD's "Shadow Lane" facility.  He later worked at two satellite offices before being transferred back to Shadow Lane in February 2003.  Pauluk did not want to return to Shadow Lane due to concerns about the presence of mold.  Shadow Lane, along with several other Clark County buildings, suffered from chronic roof and water leakage problems that resulted in the proliferation of toxic mold inside the facilities.  Pauluk was transferred back to Shadow Lane, over his objection, because his supervisor had been reassigned to that facility.

Between 2003 and 2005, while he was working at Shadow Lane, Pauluk complained repeatedly about mold. For example, he requested testing of a ceiling panel above his desk "[d]ue to the history of mold" in the building, and he reported "mold spores" found near his desk.  Pauluk repeatedly requested, both orally and in writing, that he be transferred from Shadow Lane because mold exposure was adversely affecting his health.

Defendants Edmund Wojcik and Glenn Savage worked at Shadow Lane during the time at issue. Both were Pauluk's superiors in his chain-of-command. Pauluk reported to his immediate supervisor, Paul Klouse, who reported to Wojcik, who reported to Savage. When Pauluk made a transfer request or a report about mold, it was ordinarily made to Klouse and was then "channel[ed]" up to Wojcik and Savage. On one occasion, Pauluk personally asked Wojcik for a transfer, but Wojcik told Pauluk that he needed to follow the proper "channel" when making a transfer request. Although the parties dispute the manner in which Wojcik and Savage responded to Pauluk's complaints about mold, they agree that all of Pauluk's transfer requests were denied.

Plaintiffs maintain that Pauluk's exposure to mold at Shadow Lane led to Pauluk's illness and eventual death. Pauluk was exposed to mold starting as early as 1998, but he did not start having health problems until he was transferred back to Shadow Lane in 2003. Shortly after this transfer, Pauluk began to experience a number of adverse health effects, including "mental confusion & slow thinking," "chronic exhaustion," "headaches," "chronic diarrhea," "airway obstruction in [his] lungs," breathing problems, "chills," a "stiff neck," "cramps in back and abdomen," vomiting, kidney cysts, and dehydration. Deposition testimony from several doctors corroborated that Pauluk was ill and that the illness was caused by mold. One doctor testified that he treated Pauluk for a variety of ailments that the doctor concluded were the result of "toxic mold exposure." Another doctor treated Pauluk for "aspergillosis," an infection caused by mold. A third doctor, who treated Pauluk toward the end of his life, testified that mold exposure in the workplace "was causally related to [Pauluk's] illness."

Pauluk's poor health eventually forced him to leave his job. In October 2005, Pauluk took leave under the Family and Medical Leave Act based on his doctor's Labor Department certification stating that he was suffering from "[t]oxic mold exposure with airflow obstruction." Pauluk's illness progressively worsened during the next two years. He died on July 17, 2007. Pauluk's death certificate originally stated that his cause of death was "end stage debility" and "chronic obstructive pulmonary disease." The certificate was amended a month later to state that the cause of death was "mixed mold mycotoxicosis."

## B. Procedural History

After Pauluk's death, his wife and daughters filed suit under 42 U.S.C. § 1983 against the CCHD, Wojcik, and Savage. They alleged that CCHD and the individual Defendants' role in exposing Pauluk to a dangerous, mold-infested work environment caused his death. They brought claims under the Due Process Clause of the Fourteenth Amendment as well as under state law. After years of litigation in state and federal court, Wojcik and Savage moved for summary judgment. They contended that there was insufficient evidence to support Plaintiffs' claims (1) that Shadow Lane was unconstitutionally unsafe, (2) that the defendants acted with deliberate indifference, and (3) that there was a causal relationship between conditions at Shadow Lane and Pauluk's death. Wojcik and Savage also argued that they were entitled to qualified immunity.

The district court granted in part and denied in part Wojcik and Savage's motion for summary judgment. The court granted summary judgment to them on a negligent

supervision and training claim but denied summary judgment as to all other claims.

Defendants Wojcik and Savage filed this interlocutory appeal seeking review of the district court's order denying qualified immunity. On July 2, 2014, a motions panel of this court denied without prejudice Plaintiffs' motion to dismiss for lack of jurisdiction. *See Nat'l Indus., Inc. v. Republic Nat'l Life Ins. Co.*, 677 F.2d 1258, 1262 (9th Cir. 1982) (stating that a merits panel may consider appellate jurisdiction despite an earlier denial of a motion to dismiss).

## II.  Standard of Review

We review *de novo* a challenge to our appellate jurisdiction over an interlocutory appeal. *Bingue v. Prunchak*, 512 F.3d 1169, 1172 (9th Cir. 2008). We also review *de novo* an interlocutory appeal from the denial of summary judgment based on qualified immunity. *Kennedy*, 439 F.3d at 1059.

## III.  Appellate Jurisdiction

Plaintiffs contend that we lack jurisdiction over this interlocutory appeal because the district court based its denial of summary judgment on purely factual grounds. The individual Defendants, on the other hand, contend that we have jurisdiction over the "purely legal" question of whether, "assuming the factually-supported version of events offered by [Plaintiffs] is correct," the district court erred in denying qualified immunity. We agree with the individual Defendants.

In general, we have jurisdiction to hear appeals only from "final decisions." 28 U.S.C. § 1291; *Johnson v. Jones*, 515 U.S. 304, 309 (1995). However, the Supreme Court has created an exception to the final judgment rule for certain interlocutory appeals when the district court has denied a motion for summary judgment based on qualified immunity. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

Not every interlocutory appeal from a denial of a motion for summary judgment based on qualified immunity is immediately appealable. The Supreme Court has distinguished between (1) an appeal raising the "purely legal" question of whether the facts alleged by the plaintiff demonstrate a violation of clearly established law, and (2) an appeal contesting the district court's conclusion that a genuine issue of material fact exists. *Johnson*, 515 U.S. at 313, 319–20; *see also Cunningham v. City of Wenatchee*, 345 F.3d 802, 807 (9th Cir. 2003); *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996). Since its decision in *Johnson*, the Supreme Court has repeatedly stated that a court of appeals has jurisdiction over an appeal from a denial of qualified immunity, even when the district court's order concludes that there are disputed issues of material fact. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018–20 (2014); *Behrens*, 516 U.S. at 312–13 ("Denial of summary judgment often includes a determination that there are controverted issues of material fact, and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable." (citation omitted)). Because we do not have jurisdiction over a district court's determination that there are genuine issues of material fact,

we cannot review Wojcik and Savage's arguments that there was insufficient evidence to show that Shadow Lane was unsafe, that the defendants acted with deliberate indifference, or that there was a causal relationship between the conditions at Shadow Lane and Pauluk's death.   But we do have jurisdiction, construing the facts and drawing all inferences in favor of Plaintiffs, to decide whether the evidence demonstrates a violation by Wojcik and Savage, and whether such violation was in contravention of federal law that was clearly established at the time.   *See Behrens*, 516 U.S. at 312–13; *Kennedy*, 439 F.3d at 1060.

## IV.  Qualified Immunity

We apply a two-part analysis in qualified immunity cases. *Kennedy*, 439 F.3d at 1060.   "First, a court must determine whether—resolving all disputes of fact and credibility in favor of the party asserting the injury—the facts adduced at summary judgment show that the officer's conduct violated a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).   Second, "if the court determines that the conduct did violate a constitutional right, [the] second prong requires the court to determine whether, at the time of the violation, the constitutional right was 'clearly established.'" *Id.*   We conclude, viewing the facts in the light most favorable to Plaintiffs, that Plaintiffs have shown a violation of the constitutional right, grounded in the Fourteenth Amendment's Due Process Clause, to be free of state-created danger.   We nonetheless reverse the district court's denial of summary judgment because it was not clearly established, at the time of Wojcik and Savage's unconstitutional actions, that the state-created danger doctrine applied to claims based on physical conditions in the workplace.

## A.  Due Process

Plaintiffs rely on a line of cases holding that exposure by a state actor to a state-created danger violates due process. The individual Defendants rely on *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), in which the Supreme Court held that a state actor has no duty under the Due Process Clause to provide a safe workplace.  We address each line of authority in turn, before turning to the interaction between the two.

### 1.  State-Created Danger

The "general rule" is that a state actor is not liable under the Due Process Clause "for its omissions." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000).  There are two exceptions to this general rule: "(1) when a 'special relationship' exists between the plaintiff and the state (the special-relationship exception); and (2) when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger' (the state-created danger exception)." *Patel v. Kent Sch. Dist*, 648 F.3d 965, 971–72 (9th Cir. 2001) (citations omitted).  We are concerned here with the state-created danger exception.

The exception is based in part on *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), in which the mother of a child who was beaten and permanently injured by his father brought suit against social workers and other local officials who had permitted the child to remain with his father despite receiving complaints about abuse.  The Supreme Court held that the state had no free-standing constitutional obligation to protect the child from his

abusive father. According to the Court, "the harms [the child] suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father" and the state "played no part in the[] creation" of the dangers the child faced. *Id.* at 201.

Relying on this language, our court and a majority of other circuits have held that a state actor can be held liable when that state actor did "play a part" in the creation of a danger. *See Gormley v. Wood-El*, 93 A.3d 344, 360 (N.J. 2014) ("Most federal circuit courts now recognize the state-created-danger doctrine as a basis for a substantive-due-process violation." (citing *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006))); *see also L.W. v. Grubbs (Grubbs I)*, 974 F.2d 119, 122 (9th Cir. 1992). Under the state-created danger doctrine, a state actor can be held liable for failing to protect a person's interest in his personal security or bodily integrity when the state actor affirmatively and with deliberate indifference placed that person in danger. The doctrine holds state actors liable "for their roles in creating or exposing individuals to danger they otherwise would not have faced." *Kennedy*, 439 F.3d at 1062.

Our circuit first recognized the state-created danger doctrine in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), in which a police officer pulled over a car in the early morning. After arresting the driver, the officer left the female passenger alone in a high crime area at 2:30 a.m. The passenger was subsequently attacked and raped. We held that the officer could be held liable under § 1983 for the attack and rape because, according to the plaintiff's evidence, the officer "affirmatively place[d] her in danger and then abandon[ed] her." *Id.* at 596. Since *Wood*, we have repeatedly analyzed various constitutional allegations

premised on the state-created danger doctrine. *See, e.g.*, *Campbell v. Wash. Dept. of Soc. Servs.*, 671 F.3d 837 (9th Cir. 2011); *Patel*, 648 F.3d 965; *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007); *Kennedy*, 439 F.3d at 1062; *Lawrence v. United States*, 340 F.3d 952 (9th Cir. 2003)*; Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000); *Huffman v. County of Los Angeles*, 147 F.3d 1054 (9th Cir. 1998); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997); *Grubbs I*, 974 F.2d 119; *Wood*, 879 F.2d 583.

## 2. *Collins*

Wojcik and Savage contend that the Supreme Court's decision in *Collins* precludes the application of the state-created danger doctrine in cases like this, where the danger is a physical condition in a government employee's workplace. In *Collins*, an employee for a city sanitation department died of asphyxia after he entered a manhole to unclog a sewer line. His widow subsequently brought a § 1983 action against the city, alleging "that her husband had 'a constitutional right to be free from unreasonable risks of harm to his body, mind and emotions and a constitutional right to be protected from the City of Harker Heights' custom and policy of deliberate indifference toward the safety of its employees.'" *Collins*, 503 U.S. at 126 n.9. She further claimed that "[t]he city's policy and custom of not training its employees and not warning them of the danger allegedly caused Collins' death and thus deprived him of those rights." *Id.* The Court summarized her claim as a "general allegation that the city deprived [Collins] of life and liberty by failing to provide a reasonably safe work environment." *Id.* at 125–26.

The Court held that the widow had not stated a cause of action.  Reluctant to recognize new due process claims that would overlap with tort claims under state law, the Court rejected "petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Id.* at 126.  The Court held that "the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimal levels of safety and security in the workplace." *Id.* at 130.  In short, *Collins* held "that the Constitution does not guarantee a right to a safe workplace." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998).

### 3. Reconciling *Collins* and the State-Created Danger Doctrine in Workplace Safety Cases

The threshold question before us is whether Plaintiffs' claim under the state-created danger doctrine is foreclosed by *Collins*.  We conclude that it is not.

This conclusion is supported by the *Collins* decision itself.  The plaintiff in *Collins* did not allege a due process claim under the state-created danger doctrine.  Rather, she alleged a general due process claim to a safe workplace, alleging broadly "that the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace." *Collins*, 503 U.S. at 126.  In rejecting the plaintiff's claim, the Court did not address the state-created danger doctrine.  Indeed, its reasoning suggests that its decision might have been different had the plaintiff alleged a specific state-created danger due process claim.  The Court explained that the plaintiff did "not claim that the city or any of its agents deliberately harmed her

husband" and did "not even allege that [her husband's] supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured." *Id.* at 125.

Recognizing Plaintiffs' authority to bring a state-created danger claim in this workplace safety case also accords with the general rule under due process doctrine. The general rule is that a state actor is not liable for his omissions or failure to act. *See Collins*, 503 U.S. at 126; *see also DeShaney*, 489 U.S. at 196 ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid."); *Campbell*, 671 F.3d at 842 ("It is well established that although the Constitution protects a citizen's liberty interest in her own bodily security, the state's failure to protect that interest does not violate the Fourteenth Amendment." (internal citation omitted)). The state-created danger doctrine is a recognized "exception" to this general rule. *Patel*, 648 F.3d at 972. In holding that the government had no affirmative obligation to provide a safe workplace, *Collins* appears to be an application of this general rule. It follows that the exceptions to the general rule, such as the state-created danger doctrine, should also apply to workplace safety cases.

Support for this conclusion comes from *Grubbs I*, in which we sustained a plaintiff's state-created danger claim even though it arose in the workplace. In *Grubbs I*, a case decided six months after *Collins*, a registered nurse working in an Oregon prison was raped by an inmate. The nurse brought a § 1983 action against her supervisors, and we held that she had stated a due process claim under the state-created danger doctrine. Defendants had assigned the particular inmate to work with the nurse even though they knew that (1) the inmate had a history of violence against women and

was likely to assault a woman, (2) the nurse was likely to be alone with the inmate during her rounds, and (3) the nurse had not been informed at her hiring that she would be left alone with violent offenders. *Grubbs I*, 974 F.2d at 121. We distinguished *Collins*, writing that "[u]nlike Collins, [the nurse] alleges that the Defendants took affirmative steps to place her at significant risk." *Id.* at 122. We rejected the defendants' contention that the nurse's "status as a state employee should bar her claim." *Id.*

Other courts agree that *Collins* does not foreclose application of the state-created danger exception in workplace safety cases. *See Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 537 (6th Cir. 2008) (noting that an employee can prevail against his or her employer, notwithstanding *Collins*, in state-created danger cases); *Kaucher v. County of Bucks*, 455 F.3d 418, 424–25, 431 (3d Cir. 2006) (treating plaintiffs' state created danger doctrine claim as separate and distinct from *Collins*); *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 55 n.9 (1st Cir. 2006) (assuming the state-created danger doctrine could be a theory of liability notwithstanding *Collins*, but rejecting plaintiffs' claim on the merits); *Gormley*, 93 A.3d at 362–63 (concluding that the defendants were not entitled to qualified immunity, rejecting the defendants' reliance on *Collins*, and holding that the state-created danger doctrine applied). *But see Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317, 321–23 (4th Cir. 2012) (holding that *Collins* barred a plaintiff's claim against a fire department, even though plaintiff raised a state-created danger claim).

### 4. Applying the State-Created Danger Exception to the Facts of This Case

To prevail on a state-created danger due process claim, a plaintiff must show more than merely a failure to create or maintain a safe work environment. First, a plaintiff must show that the state engaged in "affirmative conduct" that placed him or her in danger. *Patel*, 648 F.3d at 974. This "affirmative conduct" requirement has several components. A plaintiff must show not only that the defendant acted "affirmatively," but also that the affirmative conduct placed him in a "worse position than that in which he would have been had [the state] not acted at all." *Johnson*, 474 F.3d at 641 (quoting *DeShaney*, 489 U.S. at 201); *accord Kennedy*, 439 F.3d at 1063. The affirmative act must have exposed the plaintiff to "an actual, particularized danger," *Kennedy*, 439 F.3d at 1063, and the resulting harm must have been foreseeable, *see Lawrence*, 340 F.3d at 957. Second, the state actor must have acted with "deliberate indifference" to a "known or obvious danger." *Patel*, 648 F.3d at 974 (quoting *L.W. v. Grubbs (Grubbs II)*, 92 F.3d 894, 900 (9th Cir. 1996)). "Deliberate indifference" requires a "culpable mental state" more than "gross negligence." *Id.*; *see Grubbs II*, 92 F.3d at 898.

Plaintiffs' evidence, if true, satisfies both elements of a state-created danger claim. First, Pauluk's 2003 transfer back to Shadow Lane was "affirmative" conduct. Pauluk clearly did not want to return to Shadow Lane and was transferred "involuntarily." There is sufficient evidence in the record that either or both Wojcik and Savage were sufficiently involved in the decision to transfer that a reasonable jury could conclude they should bear some responsibility for that transfer. Further, the 2003 transfer back to Shadow Lane

placed Pauluk in a "worse position" than before. Only after the transfer did Pauluk begin to suffer from mold-related health problems. The harm that Pauluk suffered was foreseeable, as Pauluk had opposed the transfer specifically on the ground that he feared he would become ill due to toxic mold exposure.

Second, construing the facts in the light most favorable to Plaintiffs, Wojcik and Savage acted with deliberate indifference in exposing Pauluk to a known and obvious danger. Plaintiffs presented evidence that Wojcik and Savage were both aware of the CCHD's long and tortured history of pervasive mold problems in multiple buildings, including the Shadow Lane facility. Plaintiffs' evidence also suggests that Wojcik and Savage were on notice of the potential health problems associated with mold exposure, as Pauluk protested his transfer on mold-related grounds and at least one other employee working at Shadow Lane had previously suffered harmful health effects from mold exposure. Further, Plaintiffs presented evidence that Wojcik and Savage actively tried to conceal the amount of, and danger posed by, the mold. This evidence would support a reasonable jury's finding that Wojcik and Savage acted with deliberate indifference toward the danger posed by toxic mold in Shadow Lane to Pauluk's health.

## B. Clearly Established Law

Although we conclude that Plaintiffs presented sufficient evidence to show a due process violation under the state-created danger doctrine, qualified immunity shields Wojcik and Savage from a § 1983 damages suit unless Pauluk's due process right was "clearly established at the time of the violation." *Espinosa v. City & County of San Francisco*,

598 F.3d 528, 532 (9th Cir. 2010).  We conclude that the right was not clearly established, and that Wojcik and Savage are therefore entitled to qualified immunity.

Plaintiffs argue that Pauluk's constitutional rights were clearly established by our decisions in *Wood* and *Grubbs I*. We easily conclude that *Wood* does not clearly establish the due process right that Plaintiffs assert.  As mentioned above, in *Wood* we held that a police officer could be liable for a rape that occurred after he abandoned the plaintiff in a high crime area in the middle of the night.  The core question in this appeal is whether *Collins* bars the application of the state-created danger doctrine in cases where the danger is a physical condition in the workplace.  Because *Wood* did not involve a dangerous workplace, it does not speak to this question.

*Grubbs I* presents a closer analogy to this case.  However, as recounted above, the danger in *Grubbs I* was a human actor who posed a known threat.  In contrast, Pauluk was not harmed by a human agent, but rather by a physical condition in the building where he worked.  This case is factually very similar to *Collins*, where, as here, the danger was a physical danger in the workplace.  For the reasons given above, we conclude that Plaintiffs have stated a claim despite the fact that Pauluk's injury was caused by physical conditions in the workplace.  But, because the Supreme Court in *Collins* declined to find a due process violation in a case with very similar facts, we cannot say that Wojcik and Savage were "on notice" that their conduct was unlawful under clearly established law.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

### C. Remaining *Monell* Claim

The CCHD, a county agency, was not party to this interlocutory appeal and remains a defendant. A county agency is not entitled to qualified immunity and may be held liable for constitutional violations by its employees under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and related cases. We express no view on the possible *Monell* liability of the CCHD under the state-created danger doctrine, leaving that question to the district court in the first instance.

### Conclusion

We hold that the state-created danger doctrine is a viable theory of due process liability under § 1983, even in workplace environments. However, in light of the factual similarity between this case and *Collins*, we hold that the district court erred in denying qualified immunity to Wojcik and Savage. We reverse and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

MURGUIA, Circuit Judge, concurring in part and dissenting in part:

I fully agree with the opinion's analysis as to the scope of this court's jurisdiction to review the district court's denial of summary judgment on qualified immunity grounds, and with its conclusion that the district court erred in denying qualified immunity to Wojcik and Savage. However, even accepting

as true the plaintiffs' version of events, *see Behrens v. Pelletier*, 516 U.S. 299, 313 (1996), I respectfully disagree that the plaintiffs have presented a cognizable claim that Wojcik and Savage affirmatively acted with deliberate indifference to Pauluk's substantive due process rights under the state-created danger doctrine.[1]

I.

The state-created danger exception is a logical corollary to the well-settled rule that the government has no general duty under the Constitution to protect people from privately-inflicted harm.    In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court declared that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors," *id.* at 195.    In the same breath, however, the Court also recognized that there may be circumstances in which the government must provide protection because it "played [a] part in the[] creation" of a dangerous situation or did something "to render [an individual] more vulnerable to" a pre-existing danger. *Id.* at 201.    It is when "the state has *affirmatively* placed the plaintiff" in harm's way that a

---

[1] I note at the outset that the constitutional issue on which I dissent is not dispositive to this appeal, and I would not have reached it at all—particularly in light of the fact that the liability of the entity who appears the most responsible for the decedent's injuries—the Clark County Health District ("CCHD")—remains outstanding.  As a municipal entity, the CCHD has no immunity under § 1983 and is not a party to this appeal. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980). CCHD's potential liability under *Monell* is therefore not an issue that is presently before us on interlocutory review from the district court's denial of qualified immunity to the individually named defendants.

reciprocal duty to protect may attach.  *Ketchum v. Alameda County*, 811 F.2d 1243, 1247 (9th Cir. 1987) (emphasis added).

But inherent in our characterization of the state-created danger doctrine as an "exception" to the ordinary rule, *see Patel v. Kent Sch. Dist.*, 648 F.3d 965, 972 (9th Cir. 2001), is the principle that the government does not violate the Constitution "whenever someone cloaked with state authority causes harm," *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  The substantive component of the Due Process Clause only prevents the state from engaging in conduct "intended to injure in some way unjustifiable by any government interest." *Id.* at 849.  "[O]nly the most egregious official conduct" crosses the constitutional line so as to constitute a deprivation of due process. *Id.* at 846.  To this end, we have made clear that gross negligence on the part of the government actor is not enough. *Patel*, 648 F.3d at 974; *L.W. v. Grubbs* ("*Grubbs II*"), 92 F.3d 894, 900 (9th Cir. 1996); *see also Lewis*, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").  As the opinion observes, an individual can recover on a § 1983 claim under the state-created danger doctrine only by showing that the state officials in question acted with "deliberate indifference" to a "known or obvious danger" that they had an affirmative role in subjecting the plaintiff to. *Patel*, 648 F.3d at 974; *Grubbs II*, 92 F.3d at 900.

As my concurring colleague notes, *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), on which defendants primarily rely, does not itself speak to the scope of the state-created danger doctrine.  Nevertheless, it is easy to situate its holding within the aforementioned framework.  In *Collins*,

the Supreme Court applied the general rule that state actors are liable only for actions that violate constitutional rights, not omissions, and concluded that the Due Process Clause does not impose a free-standing duty upon a municipality to provide its employees with certain minimal working conditions.[2]  503 U.S. at 125–30; *cf. Deshaney*, 489 U.S. at 195 ("The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."). At the same time, however, nothing in *Collins* abrogated the Constitution's guarantee of freedom from unreasonable *state-created* dangers.  In other words, public employees—like any citizen—can recover under the state-created danger doctrine for workplace injuries that are severe enough to offend due process—provided, of course, that the employee shows that a state official affirmatively created the unsafe working environment and acted with the requisite deliberate indifference in subjecting the employee to that workspace. *See, e.g.*, *L.W. v. Grubbs* ("*Grubbs I*"), 974 F.2d 119, 122 (9th Cir. 1992) (finding

---

[2] The plaintiff in *Collins* had brought suit after her husband, a city employee within the sanitation department, died of asphyxia in a manhole where he was fixing a sewer line.  503 U.S. at 117.  The employee's widow alleged that the city had violated the decedent's liberty interest by failing to train its employees about the dangers of working in sewer lines and manholes or provide adequate safety equipment at job sites. *Id*.  The *Collins* Court firmly rejected the plaintiff's theory of liability, concluding that nothing in the Constitution imposes a duty on municipal entities to provide a reasonably safe work environment for its employees. *Id.* at 126.  Nor did the city's purported failure to train or warn its employees amount to an omission that the Supreme Court believed could be properly characterized as arbitrary or conscience-shocking in the substantive-due-process sense. *Id.* at 128.  In no uncertain terms, the Supreme Court held that "[t]he Due Process Clause . . . does [not] guarantee municipal employees a workplace that is free of unreasonable risks of harm." *Id.* at 129.

nurse's status as prison employee did not bar her § 1983 claim after she was raped by a violent sex offender after being assigned to work alone in the medical clinic with him).

With these principles in mind, I turn to the issue on which I diverge from the opinion: whether two municipal supervisors violated a federal constitutional obligation after an employee died from a generalized exposure to toxic mold.

## II.

As noted above, the state-created danger doctrine requires affirmative action by state officers; the state's failure to protect an individual from an unsafe environment does not give rise to liability under the state-created danger doctrine. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). We have clarified that "affirmative conduct" means that the state's actions must have placed the plaintiff in a "worse position than that in which he would have been had it not acted at all." *Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007) (quoting *DeShaney*, 489 U.S. at 201); *see also Kennedy*, 439 F.3d at 1062 ("[W]e examine whether the [official] left the person in a situation that was more dangerous than the one in which they found him." (citation omitted)). In the context of this case, I believe that there are two reasons why the plaintiffs' allegations fail to satisfy this standard—one factual, one jurisprudential.

## A.

First, the universe of evidence from the summary judgment record that a reasonable jury could attribute to Wojcik and Savage is scant. Accepting the plaintiffs' version of events as true, as we must at this interlocutory stage,

Pauluk was a veteran employee of the CCHD who died after being exposed to toxic mold at Shadow Lane, where he was reassigned over his objections in 2003. It is undisputed that Shadow Lane suffered from structural deficiencies in the building that let in rainwater.

During his tenure there, Pauluk repeatedly complained about mold to the intermediate supervisors in his chain of command, which included the defendants Wojcik and Savage, both of whom also worked at Shadow Lane. Specifically, Pauluk requested to transfer out of Shadow Lane or to move desks within the building. Whenever Pauluk would make such a request, it would be sent to his immediate boss and then "funnel[ed]" up to Wojcik and Savage. On one occasion, Pauluk personally asked Wojcik for a transfer, but Wojcik told Pauluk that he needed to follow the proper "channel[s]" when making a transfer request. All of Pauluk's transfer requests were ultimately denied. Savage was told that transferring Pauluk would result in "chaos to the overall business of the Health District" and that Pauluk's position involved a "main office function"—the main CCHD office being the Shadow Lane facility. Nevertheless, in 2003, in response to Pauluk's concerns, ceiling tiles were removed and tested for mold. Savage also assisted Pauluk in 2004 with taking photographs of suspected mold growth and forwarding it to the administration, and Wojcik sent an e-mail to his chain of command seeking to have the materials gathered by Savage and Pauluk tested. As a result of their efforts, maintenance staff removed and replaced four stained ceiling tiles and one fluorescent lens near Pauluk's work station. In the end, however, Pauluk left Shadow Lane in October 2005 due to medical problems associated with "[t]oxic mold exposure." Unfortunately, Pauluk's health continued to deteriorate and he died in 2007.

The family's primary contention is that Wojcik and Savage failed to protect Pauluk from exposure to mold by not transferring him away from Shadow Lane. But keeping Pauluk at a facility that was infested with mold is not "affirmative action." *See Kennedy*, 439 F.3d at 1062 ("In examining whether an officer affirmatively places an individual in danger . . . we examine whether the officer[] left the person in a situation that was more dangerous than the one in which they found him."). The family also argues that Wojcik and Savage acted affirmatively by denying Pauluk's requests to transfer. However, these actions fail the "no worse position" test too: regardless of whether defendants denied Pauluk's requests or simply ignored them, Pauluk would have remained in the same position—purportedly being exposed to toxic mold at Shadow Lane. *See Johnson*, 474 F.3d at 641 (concluding that city's decision to switch from a more effective crowd-control procedure to a less effective plan was not "affirmative action," precluding liability to plaintiffs who were injured during a riot at a Mardi Gras celebration).

The opinion nevertheless concludes that Wojcik and Savage's decision to transfer Pauluk back to the Savage Lane facility in 2003 constitutes the requisite affirmative action. But in opposition to the defendants' motion for summary judgment, plaintiffs insisted that CCHD exposed Pauluk to mold on two other occasions prior to 2003—in 1998 and 2000. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, *Pauluk v. Savage*, No. 07-CV-1681 at *10 (D. Nev. Oct. 7, 2013), ECF No. 131 ("[T]he record evidence shows CCHD affirmatively placed Dan Pauluk in harms way on no less than three (3) occasions—in 1998, 2000 and 2003—then the Defendants have failed to meet their burden on summary judgment in that the Defendants

affirmatively and with deliberate-indifference engaged in conscience-shocking conduct."). If Pauluk's risk of illness from mold exposure pre-dated his 2003 reassignment to Shadow Lane, then Wojcik and Savage could not have placed Pauluk in any worse of a position than if he had never been transferred. Therefore, even reading the record in the light most favorable to the plaintiffs, plaintiffs' claim fails as a matter of law because, after the 2003 transfer, Pauluk was in "no worse position" than before. *See Johnson*, 474 F.3d at 641.

## B.

I further disagree that moving Pauluk back to Savage Lane amounts to "affirmative action" in the constitutional sense. The previous circumstances in which this court has grappled with the state-created danger doctrine do not remotely resemble the facts of this case. Every instance in which we have permitted a state-created danger theory to proceed has involved an act by a government official that created an obvious, immediate, and "particularized danger" to a specific person known to that official. *See Kennedy*, 439 F.3d at 1067 (explaining that "affirmative action" requires the state actor to "create[] an actual, particularized danger [the injured party] would not otherwise have faced"). We have also extended the doctrine only to encompass claims in which the official's act caused the harm, as opposed to merely increasing a risk to the plaintiff.

In this circuit, the state-created danger doctrine begins with *Wood v. Ostrander*, in which the court held that police officers who had stranded a woman in a high crime area at 2:30 in the morning could be liable under § 1983 after the woman was sexually assaulted. 879 F.2d at 588–90.

Similarly, in *Penilla v. City of Huntington Park*, we denied qualified immunity to officers who had responded to a 911 call, found Penilla to be in grave need of medical care, and yet canceled the request for paramedics, broke the lock and door jamb on the front door of Penilla's residence, moved him inside the house, locked the door, and left him to die. 115 F.3d 707, 708 (9th Cir. 1997). And, in *Munger v. City of Glasgow*, we found evidence of affirmative action by the state where police officers ejected an intoxicated patron from a bar wearing only a t-shirt and jeans in sub-freezing temperatures; the patron died from hypothermia. 227 F.3d 1082, 1087 (9th Cir. 2000).

In *Kennedy v. City of Ridgefield*, we likewise affirmed the denial of qualified immunity to a police officer who had informed the plaintiff's neighbor—an individual with known violent tendencies and against whom the plaintiff had made allegations of child abuse—that he was being investigated for molesting the plaintiff's daughter. 439 F.3d at 1057, 1067. The officer had promised to warn the plaintiff before approaching her neighbor, and assured her that police would patrol her neighborhood. *Id.* at 1058. The neighbor later broke into the plaintiff's house and shot her and her husband while they were sleeping. *Id.* at 1058. The *Kennedy* court explained that the officer had "affirmatively created an actual, particularized danger [the family] would not otherwise have faced" by confronting the suspect without notifying the Kennedy family as promised. *Id.* at 1063.

*Kennedy* relied substantially on our's holding in *Grubbs I*, in which we found that a nurse in a medium-security correctional institution had stated a claim under the Fourteenth Amendment after an inmate with known violent propensities raped and terrorized her. *Grubbs I*, 974 F.2d at

120–22. State officials had assigned the inmate to work in the medical clinic with the plaintiff and had failed to inform her that she would be left alone with violent sex offenders. *Id.* at 120. The *Grubbs I* court concluded that the plaintiff had adequately alleged that the defendants' acts had "independently created the opportunity for and facilitated [the inmate's] assault on her" and allowed her claim to proceed to trial. *Id.* at 122. The court emphasized that, in assigning the inmate to work with the plaintiff while also misrepresenting the risks attending to the plaintiff's work, the defendants had created the danger by preventing the plaintiff from defending herself or averting an attack.[3] *Id.* at 122.

The common elements in all of these cases that justified our imposing liability were the acuteness of the danger to the plaintiff, the temporal proximity between the official's act and the injury, and the clear traceability of the injury to the official's conduct. The facts here are markedly different: the plaintiffs have alleged that Wojcik and Savage violated Pauluk's constitutional rights by moving him into a municipal building where he was exposed to toxic mold over the course of several years—along with countless other employees, including the defendants. Wojcik and Savage's decision to reassign Pauluk more closely resembles the cases in which this court has declined to find a cognizable due process violation due to the unforeseeable nature of the plaintiffs' injuries and the fact that the danger facing the plaintiff

---

[3] The court never had to evaluate the qualified immunity question in *Grubbs*, which came to the court on an appeal from a motion to dismiss. Following a trial, however, the jury found that the supervisor who was responsible for creating the danger to the plaintiff had acted only with gross negligence, but not with the deliberate indifference necessary to sustain liability. *Grubbs II*, 92 F.3d at 895.

existed independent of state action. *See, e.g.*, *Patel*, 648 F.3d at 976 (holding no rational fact finder could conclude that a teacher acted with deliberate indifference to her student's well-being because the teacher "did not know there was any *immediate* danger in allowing [the plaintiff] to briefly use the next-door bathroom alone"); *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1061 (9th Cir. 1998) (finding no liability where an individual was shot during a barroom brawl by an off-duty deputy on the grounds that the injury was an unforeseeable consequence of a county policy requiring off-duty officers to carry a firearm); *see also Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003) ("[I]n each of the cases in which we have applied the danger-creation exception, ultimate injury to the plaintiff was foreseeable."). The link between the challenged conduct and Pauluk's untimely death is simply too attenuated to support Wojcik and Savage's liability.

## III.

In addition to showing affirmative conduct, the family must also show that the defendants acted with "deliberate indifference" to Pauluk's health and safety. We have repeatedly affirmed that the standard for deliberate indifference is demanding; it requires a showing that the "defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Grubbs II*, 92 F.3d at 899 (citation omitted); *see also Patel*, 648 F.3d at 974 ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (internal quotation marks omitted)). The defendant is liable if he "*knows* that

something *is* going to happen but ignores the risk." *Grubbs II*, 92 F.3d at 900 (first emphasis added).

The opinion concludes that the deliberate indifference requirement is satisfied because Wojcik and Savage were aware that the CCHD had a history of pervasive mold problems throughout multiple buildings, and that Shadow Lane suffered from water damage. There is some evidence that one other employee working in Shadow Lane suffered from the ill-effects of mold exposure before Pauluk was transferred back to the facility.

I disagree that these facts, alone, demonstrate Wojcik and Savage's deliberate indifference to any danger Pauluk was exposed to at Shadow Lane. In *Penilla*, by contrast, the officers knew Penilla was in grave condition and required prompt medical attention, yet they did the opposite of what a reasonable person would expect them to do. In fact, the officers made the situation worse by calling off medical assistance already en route. *Penilla*, 115 F.3d at 708. *Kennedy* and *Grubbs* both concerned circumstances in which the government official actively concealed a known risk of harm from the plaintiff. Here, at most, Wojcik and Savage knew that a workplace free of mold was preferable to one with mold, but do not appear to have been aware that moving Pauluk to a contaminated building would cause him to become deathly ill.[4] *See Patel*, 648 F.3d at 975–76 (refusing to find liability where extent of the risks were unknown to the defendant). Further, the family admits that Savage "assist[ed] Pauluk" in his attempts to report the mold problems by "removing ceiling tiles, looking above the ceiling tiles and

---

[4] The opinion's assertion that Wojcik and Savage actively tried to conceal the existence of mold is not supported by the record.

taking photographs in the area where Pauluk's desk was locat[ed]." This indicates that Savage was sensitive to Pauluk's complaints and wanted them to be resolved. Wojcik demonstrated similar sympathy towards seeing Pauluk's concerns addressed. Without the requisite mental state, there can be no constitutional violation premised on state-created danger.

IV.

As in all state-created danger cases, the facts before us are undeniably tragic. But the Fourteenth Amendment is not a panacea for all wrongs. The Supreme Court "has always been reluctant to expand the concept of substantive due process," and the Fourteenth Amendment "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Collins*, 503 U.S. at 125, 128; *see also Lewis*, 523 U.S. at 848 ("[T]he Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'"). To the extent Pauluk has a remedy, I believe it is properly found under Nevada state law. *See Patel*, 648 F.3d at 976 ("Whatever liability [the defendant] may face, that liability must come from state tort law, not the Fourteenth Amendment."). Because I cannot join my esteemed colleagues in their sweeping holding that the facts alleged establish a Fourteenth Amendment violation by Wojcik and Savage, I respectfully dissent from that portion of the opinion.

NOONAN, Circuit Judge, dissenting:

Today, the majority holds that the state-created danger doctrine—a theory of constitutional harm whose contours have been "clearly established" by at least nine published opinions of this court over the course of two decades—is no longer sufficiently "clear" in light of a single case which addresses an unrelated legal theory. I respectfully dissent.

## I.

In this circuit, the state-created danger doctrine begins with *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In *Wood*, a police officer arrested an intoxicated driver, impounded the vehicle, and refused the passenger's request for a ride, leaving her stranded late at night in a high crime area. *Id.* at 586. On her walk home, she accepted a ride from a stranger, who ultimately took her to a secluded area and raped her. *Id.* On these facts, this court held that the plaintiff raised a triable issue as to whether the officer's conduct "affirmatively placed the plaintiff in a position of danger." *Id.* at 589–90. The court reasoned that while the officer did not assault Wood himself, he acted "in callous disregard for [her] safety" by exposing her to a known and "inherent danger." *Id. Wood* and the cases that follow have emphasized that in order for liability to attach under the state-created danger doctrine, the state actor must knowingly create "an actual, particularized danger." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006). However, the facts of these cases make clear that the state's actions need not be the only but-for cause of the ultimate harm, and that its foreseeability need not be certain to be actionable.

Indeed, in *Wood*, it was far from certain that the plaintiff would be accosted on her way home; furthermore, her decision to accept a ride from a stranger in a high-crime area was an intervening act that was an independent cause of the harm she sustained. Yet this court had no trouble concluding that the causal nexus between the officer's conduct and the harm endured was sufficiently close to warrant holding the state liable, characterizing it as "a matter of common sense." *Wood*, 879 F.2d at 590.

In *Kennedy*, an officer was called upon to investigate an allegation made by Jay and Kimberly Kennedy that their thirteen year-old neighbor, Michael Burns, had molested their daughter. 439 F.3d 1055, 1057 (9th Cir. 2006). Kimberly informed the officer that she believed Burns was violent and lived in an unstable household. *Id.* at 1057–58. In response, the officer assured her that she would be given notice prior to any police contact with Burns. *Id.* at 1058. A few weeks later, the officer drove to Burns' house and informed him of the molestation allegations made by the Kennedys, and immediately after, drove to the Kennedy house to update them on the situation. When Kimberly expressed her displeasure with the officer for failing to provide her with advance notice of his contact with Burns as he had promised, the officer assured her that the police would patrol the area and "keep an eye" on Burns. *Id.* The police never conducted the promised patrol. The next morning, Burns broke into the Kennedys' home and shot them in their sleep, killing Jay and severely wounding Kimberly. *Id.* at 1057.

While Burns "had a predilection for violence," *id.* at 1064, it was by no means certainly foreseeable that even a violent thirteen year-old could commit such a heinous act. However, in affirming the denial of qualified immunity to the

officer, this court clarified that "for a danger to exist, the exact injury inflicted by a third party [need not] have been foreseeable"; rather, liability attaches where the state actor places a plaintiff "in a situation more dangerous than the one she already faced." *Id.* at 1064 n.5; *see also Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000).

In the case at bar, the facts as alleged state that defendants had full knowledge of the mold problem at Shadow Lane in 2003 when, over Pauluk's objections, it transferred him there. Pauluk was therefore willfully exposed to a mold spore infestation, and all its attendant health risks, with every breath he took. It would be a cruel irony to hold that a harm that strikes at the very heart of a state agency's core competency is not sufficiently "particularized" or "foreseeable" to it for purposes of the state-created danger doctrine. Indeed, the harms suffered in *Wood* and *Kennedy* were arguably more attenuated than what Pauluk faced. In those cases, the officers' conduct only created an increased probability of harm to the plaintiffs; conversely, it was certain that Pauluk would suffer at least some harm due to the inevitable inhalation of mold.

No basis exists to distinguish this case from *Wood*, *Kennedy*, or any other published opinion of this court upholding the applicability of the state-created danger doctrine. I would affirm the district court's denial of summary judgment. I therefore concur with the majority's conclusion that, viewing the facts in the light most favorable to plaintiffs, they have shown a violation of the Fourteenth Amendment under the state created danger doctrine.

## II.

In *Collins v. City of Harker Heights, Tex.*, the plaintiff's deceased spouse, an employee of a municipal sanitation department, died from asphyxiating on noxious fumes after entering a manhole to fix a sewer line. 503 U.S. 115, 117 (1992). Collins brought suit under 42 U.S.C. § 1983, alleging that the City violated the substantive Due Process Clause of the Fourteenth Amendment by failing to maintain a minimal level of workplace safety. The Supreme Court rejected this argument, holding that the Fourteenth Amendment does not encompass a generalized duty to "provide [government] employees with minimal levels of safety and security in the workplace." *Id.* at 126.

While Collins and Pauluk both died from inhaling poisonous air in the workplace, the similarity between their cases ends there. Indeed, *Collins* does not ever discuss the state-created danger doctrine—the theory upon which Pauluk's entire case hinges. To hold that *Collins* defines the contours of a doctrine that it does not even mention would expand its holding far beyond what the Court could have reasonably intended.

The *Collins* Court emphasized that the plaintiff "does not claim that the city or any of its agents deliberately harmed her husband. In fact, she does not even allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured." *Id.* at 125. Pauluk's case therefore presents the precise facts that the *Collins* Court deemed were inapplicable to its analysis and holding. Accordingly, *Collins* does not counsel against affirming the district court here. Indeed, the majority appears to concede that *Collins* is

distinguishable, but concludes that even assuming Pauluk has stated a constitutional violation, the factual circumstances of this case are simply too similar to the facts of *Collins* for the defendants to have been "'on notice' that their conduct was unlawful under clearly established law." Majority Op. at 19.

The law governing the state-created danger doctrine is "clearly established" by the controlling precedent discussed above such that "any reasonable official in [defendants'] shoes would have understood that [they were] violating it." *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765 (2015) (citations omitted). Indeed, in light of these cases, the constitutional question has been "placed. . .beyond debate." *Id.* A case which presents some factual similarities but lacks any legal nexus to the state-created danger doctrine cannot revive that debate, nor can it serve to convolute what this court has defined with pellucid clarity. *Collins* does not control here. Accordingly, I dissent.